**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **PLUMBERS AND PIPEFITTERS UNION NO. 421 HEALTH AND WELFARE FUND,** *et al.,* | |
| Plaintiffs, | Civil Action No. 5:11-CV-221(HL) |
| v. | |
| **BRIAN TREMATORE PLUMBING & HEATING, INC.** | |
| Defendant. | |

## AMENDED ORDER

In light of additional argument from the parties and further research, the Court finds it prudent to enter an Amended Order on the Motion to Strike filed by Plaintiffs Plumbers and Pipefitters Union No. 421 Health and Welfare Fund *et al.*, ("Plaintiffs" or "the Fund") (Doc. 30) and the Motion for Summary Judgment, also filed by Plaintiffs (Doc. 22). This Amended Order, which takes into consideration the parties' supplemental briefs (Docs. 53, 54, 55), serves to set out the factual issues that are left open and also articulates the proper legal standard that will apply at trial.[1]

These Motions are part of an ERISA action brought by Plaintiffs to recover payment allegedly due from Defendant Brian Trematore Plumbing & Heating, Inc. ("Defendant"). For the reasons stated more fully below, the Motion to Strike is

---

[1] Pertinent changes to this Order can be found on pages 14, 17, 19, and 21-22.

denied and the Motion for Summary Judgment is granted in part and denied in part.

## I.   FACTUAL BACKGROUND

The facts of this case are largely undisputed. Plaintiffs are a Fund which holds assets for employee benefits under ERISA. (Plaintiffs' Statement of Material Facts ("PSMF")[2] ¶ 1.) The Fund is managed by a group of Trustees who owe a fiduciary duty to the Fund. (PSMF ¶¶ 2, 3, 4.) The Trustees are responsible for maintaining records pertaining to the management of the Fund. (PSMF ¶ 4.)

Defendant, a New Jersey corporation, performs large-scale plumbing and pipefitting work. (Defendant's Response Brief, Doc. 25, p. 3.) Brian Trematore is the sole owner and president of Brian Trematore Plumbing & Heating, Inc. (Deposition of Brian Trematore, Doc. 22-2, p. 17.) Defendant entered into a collective bargaining agreement ("CBA") with Plaintiffs. (PSMF ¶ 18.) Employers who are bound by a CBA, like Defendant, are required to pay fringe benefit contributions to the Fund at specific rates for plumbing and pipefitting work performed. In compliance with the CBA, Defendant submitted employer contribution reports and partial contribution payments to the Funds' administrator, Core Management Resources Group, Inc. ("Core"), for all covered work performed beginning in July 2007. (PSMF ¶ 19.)

---

[2] All citations to the Plaintiffs' Statement of Material Facts refer to those statements which have been admitted by Defendant.

The CBA defines covered work as:

> The Agreement covers the rates of pay, hours and working conditions of all employees engaged in the installation of all plumbing and/or pipefitting systems and component parts thereof, including fabrication, assembling, erection, installation, testing, dismantling, repairing, reconditioning, adjusting, altering, servicing and handling, unloading, distributing, tying on and hoisting of all piping materials, by any method, including all hangers and supports of every description and all other work included in the trade jurisdiction of the United Association, as defined in the current Constitution of the United Association.

(Collective Bargaining Agreement, Article III, Section 3.1, Doc. 24-10, p. 6.) The CBA refers to and incorporates the United Association ("UA") Constitution, which further defines the scope of covered work.[3] The UA Constitution lists fifty categories of covered work, including the following:

> The following is the jurisdiction of work of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada:
>
> (1) All piping for plumbing, water, waste, floor drains, drain gates, supply, leader, soil pipe, grease traps, sewage, and vent lines.
>
> …
>
> (23) The setting and erecting of all boiler feeders, water heaters, filters, water softeners, purifiers, condensate equipment, pumps, condensers, coolers, and all piping for same in power houses, distributing and boosting stations, refrigeration, bottling, distilling, and brewing plants, heating, ventilating, and air-conditioning systems.
>
> …

---

[3] The CBA notes that the agreement covers "all other work included in the trade jurisdiction of the United Association, as defined in the current Constitution of the United Association." (CBA, Art. III, 3.1.)

(32) All piping for power or heating purposes, either by water, air, steam, gas, oil, chemicals, or any other method.

…

(38) All air piping of every description.

…

(39) All temporary piping of every description in connection with building and construction work, excavating and underground construction.

…

(40) The laying out and cutting of all holes, chases and channels, the setting and erection of bolts, inserts, stands, brackets, supports, sleeves, thimbles, hangers, conduit and boxes, used in connection with the pipe fitting industry.

…

(50) Piping herein specified means pipe made from metals, tile, glass, rubber, plastics, wood, or any other kind of material, or product manufactured into pipe, usable in the pipe fitting industry, regardless of size or shapes.

(UA Constitution, Doc. 24-16, pp. 44-50.)

Pursuant to the Trust Agreement executed between the parties, the Trustees of the Fund may initiate a payroll audit of an employer's records to determine whether an employer, such as Defendant, is making full and prompt contributions to the Fund. (PSMF ¶ 20.) In this case, the Trustees directed the accounting firm LaPadula Carlson + Co. ("LaPadula") to conduct an audit for the period of July 1, 2007 through June 15, 2009. Id. This period corresponded to

construction work performed on a Marriott hotel in Raleigh, North Carolina ("the Project").

The payroll audit revealed an alleged deficiency of $82,110.09 in required contributions that Plaintiffs contend had not been paid by Defendant. (PSMF ¶ 21.) The delinquent hours were reflected in both Schedule I and Schedule II of the audit. Schedule I is a report created by comparing contribution reports submitted to Core with the reported hours on the contractor's payroll journal. (LaPadula Audit, Doc. 25-5, p. 5.) Schedule II is a report created either by reviewing agency invoices and supporting documentation from non-union labor groups directly, or by estimating the amount of hours when specific information is not available. (LaPadula Audit, Doc. 25-5, p. 5.) In this case, it is undisputed that Schedule II is comprised of hours worked on the Project by non-union, third-party subcontractors. (Doc. 36, p. 9.) Based on the delinquent amounts from Schedules I and II, Plaintiffs demanded payment from Defendant. Defendant declined to pay, claiming that the work performed was not covered by the CBA.

Both parties agree that Defendant has not paid the $82,110.09 that Plaintiffs claim it is owed.[4] Plaintiffs claim that according to ERISA § 502, Defendant is responsible for this amount, as well as liquidated damages and

---

[4] On February 28, 2013, this Court held a hearing on the pending Motions. After the hearing, Defendant drafted a check to Plaintiffs in the amount of $1,779.51, representing 117 hours' worth of unpaid contributions that Defendant admitted was owed. (Doc. 35, p. 12.) This deficiency was the result of an alleged scrivener's error. Thus, the Court assumes the amount owed is reduced to $80,330.58.

interest on the delinquent contributions, in addition to attorneys' fees and costs. 29 U.S.C. § 1132. In response, Defendant contends that it is not responsible for contributions for the work performed or, at the very least, a factual question remains about the scope of the agreement between the parties that should preclude summary judgment.

II.    **MOTION TO STRIKE**

The Motion to Strike filed by Plaintiffs argues that two categories of evidence submitted by Defendant are improper for review: (1) three photographs and a blueprint of the work site at the Marriott hotel that Plaintiffs claim were not timely submitted during the discovery period, and (2) two declarations that Plaintiffs maintain are improper expert testimony. This evidence is discussed below.

A.    **Documents Produced After Discovery Ended**

This case was filed on June 2, 2011. Discovery was extended twice and finally closed on April 18, 2012. On May 23, 2012, Plaintiffs filed a Motion for Summary Judgment. A few days before the response was due on this Motion for Summary Judgment, Defendant revealed three photographs and one blueprint of the Marriott work site that had not previously been disclosed, and relied on these photographs and the blueprint in its response to Plaintiffs' Motion. (*See* Docs. 26-4, 26-5, 26-6, 30-4.)

Plaintiffs argue for the exclusion of the photographs and blueprint under Rule 37(c). Plaintiffs contend that under Rule 37, a district court may preclude a

party from introducing evidence that was not properly disclosed under Rule 26 unless the failure was harmless or there was substantial justification for the failure. FED. R. CIV. P. 37; *see also* Goodman-Gable-Gould Co. v. Tiara Condominium Ass'n, Inc., 595 F.3d 1203, 1210 (11th Cir. 2010). Plaintiffs maintain that the evidence in this case was not properly disclosed and the failure to reveal the information was not justified.

In response, Defendant states that these documents were not identified until after the conclusion of discovery. Once the documents were discovered, Defendant contends that it supplemented its Rule 26 disclosures immediately. Defendant claims that the photographs represent a visual depiction of the testimony of Mr. Trematore about the work of Mr. Brian Kroll, one of Defendant's employees whose work is at issue in this litigation. (Doc. 32, p. 8.) As merely a visual representation, Defendant argues that there is no potential surprise or ambush for purposes of trial based on the evidence. Defendant argues that the failure to disclose before the deadline is harmless, and therefore, excused under Rule 37, which states that a party may not be allowed to use improperly-produced evidence unless the failure was "substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Defendant contends that the Court should use its discretion and allow these documents to be used, despite their late production.

After review, the Court finds that the photographs and blueprint are admissible. "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." Mitchell v.

7

Ford Motor Co., 318 F. App'x 821, 825 (11th Cir. 2009). In this case, the Court finds that Defendant, the nondisclosing party, is able to demonstrate that the failure to disclose is justified and harmless. First, the Court finds no reason to disbelieve Defendant's explanation for its late production – that the photographs and blueprint simply were not discovered until after discovery ended. Defendant supplemented its Rule 26 disclosures when the evidence was discovered (Doc. 30-4), which demonstrates that Defendant was not trying to hide evidence. Second, the Court does not find that the photographs and blueprint present any danger or surprise or prejudice to Plaintiffs as the case moves forward. Neither the photographs nor the blueprint reveals any evidence which has not previously been a part of this case. The Court finds Defendant's description of the photographs as mere visual depictions of previous deposition testimony to be accurate. The blueprint also serves as a visual depiction of a location that had previously been described by deponents. For these reasons, the Court finds that the photographs and blueprint at issue are admissible.

B.   **Declarations of Trematore and Baumann**

Plaintiffs also take issue with two declarations filed by Defendant along with its response to Plaintiffs' Motion for Summary Judgment. The declarations are from Brian Trematore, Defendant's owner and president, and Ricky Baumann, the project manager. Plaintiffs claim that these declarations contain legal conclusions and are inadmissible as expert opinion testimony. No expert

witnesses were disclosed during the discovery period, and Plaintiffs complain that these declarations are therefore improper.

Plaintiffs argue that Federal Rule of Evidence 702 applies to exclude the declarations of Trematore and Baumann as improper expert testimony. Plaintiffs contend that the evidence is "scientific, technical, or other specialized knowledge" that would serve to "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Thus, Plaintiffs argue that the evidence should be excluded because it was not properly disclosed as expert testimony according to the deadlines set in the scheduling and discovery report completed by the parties. Plaintiffs also argue that Trematore and Baumann give inadmissible legal testimony that should not be considered.

In response, Defendant argues that the declarations of Trematore and Baumann are not offered as expert testimony, and their declarations do not fall under Rule 702. Instead, Defendant claims that these two men offer their testimony as lay witnesses under Federal Rule of Evidence 701. Rule 701 provides that a lay witness who testifies in the form of an opinion shall be limited to an opinion that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. Defendant claims that Trematore and Baumann speak out of "particularized knowledge gained from their years of

experience." (Doc. 32, p. 4.) Thus, Defendant argues they should not be classified as experts.

Further, Defendant argues that Trematore and Baumann do not offer legal testimony. Instead, Defendant argues that the testimony simply describes the work performed by or at the direction of Defendant. This, Defendant argues, is not a legal conclusion, but instead, is offered to clarify or define terms of art where particularized knowledge of a witness would be helpful. Defendant states that Trematore and Baumann should be able to testify about work that is typically done on a construction project as well as the work that was done in this particular case.

The Eleventh Circuit has recognized that officers and employees of companies are allowed to testify as lay witnesses because of the "particularized knowledge" that they have based on their years of experience in the field. United States v. Hill, 643 F.3d 807, 841 (11th Cir. 2011). The Eleventh Circuit explained that

> most courts have permitted [owners and officers] to testify …
> without the necessity of qualifying the witness as an … expert.
> Such opinion testimony is admitted not because of experience,
> training or specialized knowledge within the realm of an expert,
> but because of particularized knowledge that the witness has by
> virtue of his or her position in the business.

Id.

In this case, the Court finds that the declaration of Trematore is not expert testimony, but instead, is testimony based on Trematore's particularized

10

knowledge of the industry. In his declaration, Trematore describes the specific work that was done on the Project, and also provides some testimony about plumbing and pipefitting work in general. However, the Court does not find that this testimony falls within the scope of Rule 702, which governs "scientific, technical, or other specialized knowledge." Instead, the Court finds that Trematore's testimony is best treated as the opinion testimony of a business owner about the manner in which that company conducts its business. The declaration is admissible.

As to the declaration of Ricky Baumann, the Court also finds that his declaration is admissible. Baumann, like Trematore, testified out of his own specialized knowledge from his fifteen years of experience in the field of plumbing and pipefitting. In Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd., 320 F.3d 1213, 1218 (11th Cir. 2003), the Eleventh Circuit upheld a district court that allowed a project manager to testify as a lay witness about business practices. In that case, the Eleventh Circuit determined that the district court was correct in allowing the project manager to testify as a lay witness and not an expert because he oversaw the project and testified out of his own experience. The district court allowed the manager to testify because of his position in the business, and the Eleventh Circuit agreed that this was acceptable.

Likewise, in this case, the Court finds that Baumann should be allowed to testify out of his own experience. Baumann has worked in the industry long

enough to have a sufficient foundation on which to base his opinion, and this Court finds that his declaration is admissible. In sum, the Motion to Strike is denied as to the three photographs, the blueprint, and the declarations of Trematore and Baumann. This evidence is all admissible and can be considered by the Court in ruling upon the Motion for Summary Judgment, examined below.

III.    **MOTION FOR SUMMARY JUDGMENT**

The issue in this case for purposes of summary judgment is whether certain work constitutes "covered work" which falls under the CBA and triggers Defendant's obligation to make contributions to the Fund. The work in dispute can be broken down into three categories, which will be discussed below: (1) the work of Brian Kroll; (2) "dry" HVAC work; and (3) non-union work. In their Motion for Summary Judgment, Plaintiffs contend that all of these categories constitute covered work and Defendant owes contributions for all delinquent hours in these categories. On the other hand, Defendant maintains that these categories do not fall within the scope of the agreements between the parties and are not covered work.

A.  **Work of Brian Kroll**

Brian Kroll was an employee of Defendant. (Declaration of Ricky Baumann, Doc. 27, ¶ 5; Deposition of Brian Trematore, Doc. 22-3, p. 78.) Kroll logged a total of 1,267 hours on the Project performing carpentry work and general labor work. (Trematore 78.) Specifically, Kroll was given the task of constructing wooden boxes or "box-outs" to allow square and rectangular shaped

sheet metal duct work, as opposed to cylinder-shaped pipes, to channel through concrete floor decks and concrete or masonry walls. (Baumann Declaration ¶ 5; Trematore 78-79.) When he finished building the box-outs, he worked doing "general labor or cleanup on the job." (Trematore 79.)

Plaintiffs argue that Kroll's work constitutes covered work because it falls under the scope of the UA Constitution. Specifically, Plaintiffs claim that Kroll's work with the box-outs is covered by the provision which defines covered work as "the laying out and cutting of all holes, chases and channels, the setting and erection of bolts, inserts, stands, brackets, supports, sleeves, thimbles, hangers, conduits and boxes, used in connection with the pipe fitting industry." (UA Constitution, Doc. 24-16, p. 50.) Based on this definition, Plaintiffs argue that Kroll's work is covered. In contrast, Defendant argues that Kroll's work is not covered. Defendant points to the testimony of Baumann, the project manager, in which he stated that Kroll was a carpenter by trade, and that he was hired to perform carpentry work and did not perform plumbing and pipefitting work. (Baumann Declaration ¶¶ 5, 9.)

The Court finds that Defendant's argument is without merit. Baumann's declaration about Kroll's work is not controlling. Even if Kroll was a carpenter, he was performing work that is covered under the broad definitional language in the UA Constitution, namely, that he was constructing "conduits and boxes, used in connection with the pipe-fitting industry." Thus, the Court finds that Kroll's task of building the box-outs is within the scope of the agreement between the parties.

13

However, the Court is unable to determine as a matter of law how many of the total 1,267 hours worked by Kroll were spent building box-outs. This is a question of fact left open for trial. At trial, the parties will have the opportunity to present evidence on how much of Kroll's time was spent performing covered work. The parties will also be given the chance to argue about how Defendant's record-keeping obligations under ERISA may impact any hours Kroll spent performing non-covered work. These record-keeping obligations and their application to the present case are discussed in Section III D, *infra.*

### B. "Dry" HVAC Work

The next category of disputed work is "dry" HVAC work. Defendant draws a distinction between "dry" and "wet" HVAC work. It contends that "wet" HVAC work is the installation of pipes that serve as a conduit for liquid or gas. (Defendant's Response to Motion for Summary Judgment, Doc. 25, p. 14-15.) "Dry" HVAC work, on the other hand, would be the installation of sheet metal and duct work. Id. Defendant argues that "[i]t has always been Defendant's position that the duct work and other 'dry' side of the HVAC is not covered work, whereas some work related to the 'wet' lines may constitute covered work." (Id., p. 15.)

Defendant's argument against including "dry" HVAC work as covered work is without merit. It is apparent to the Court that the everyday understanding of the definition of plumbing and pipefitting is different than air conditioning and duct work. However, it is also clear to the Court that the written agreement between the parties includes HVAC work in the definition of covered work. This probably

was not intended by Defendant. But the plain text of the UA Constitution nonetheless includes HVAC work. Specifically, the Court is convinced that paragraph twenty-three in the UA Constitution covers "dry" HVAC work. It states:

> (23) The setting and erecting of all boiler feeders, water heaters, filters, water softeners, purifiers, condensate equipment, pumps, condeners, coolers, and all piping for same in power houses, distributing and boosting stations, refrigeration, bottling, distilling, and brewing plants, *heating, ventilation, and air-conditioning systems.*

(UA Constitution, Doc. 24-16, p. 50 (emphasis added).) This text makes clear that the setting and erecting of all piping and components thereof used for heating, ventilation, and air-conditioning systems is considered covered work.

Defendant argues that the UA Constitution should be considered in context because it is ambiguous. *See* Trustees for Michigan BAC Health Care Fund v. OCP Contractors, Inc., 136 Fed. App'x 849, 851 (6th Cir. 2005) (determining that ambiguous language in a CBA purporting to create an obligation on the employer to contribute should be considered in light of the parties' intent). However, the Court does not find the language of the CBA to be ambiguous, and thus, the intent of the parties is irrelevant. Based on the above, contributions are owed to Plaintiffs for all "dry" side HVAC work performed.

### C. **Non-Union Work**

It is undisputed by the parties that non-union workers were employed to work on the Project. Schedule II of the audit completed by LaPadula is a record of all the work completed by non-union employees. Defendant has not paid

contributions for any of the work listed on Schedule II of the audit, arguing that contributions are not due because the work was not covered work and the work was performed by non-union employees who did not trigger the obligation to contribute to the fund under the CBA. Thus, there are two issues for the Court to determine: (1) whether the work performed by the non-union workers was covered, and (2) whether the performance of covered work by non-union employees requires contributions to the Fund under the CBA.

1.   **Whether the work was covered**

Defendant argues that there is not sufficient evidence to prove that the non-union workers performed covered work. To support its point, Defendant alleges that there were various mechanisms within the CBA to protect the union and ensure that no covered work was performed by subcontractors. Defendant states that the failure of any union worker or union supervisor to utilize these mechanisms to complain implies that the non-union workers were not performing covered work.

The Court finds that Defendant's argument misses the mark. In his deposition, Trematore stated that there were subcontractors hired to perform sheet metal work, insulation work, clean-up, painting, and general carpentry. (Trematore 101-102.) However, Trematore admitted that the carpentry work to which he referred was that done by Brian Kroll. (Trematore 102.) He further admitted that the sheet metal work fell into the category of "dry" HVAC work. (Trematore 102-03.) The painting work involved painting the gas piping on the

16

roof a certain color. (Trematore 103.) As discussed at length above, the Court finds that all of these categories of work constitute covered work based on the broad definitional limits of the UA Constitution and CBA.

Trematore's deposition confirms that the labor performed by L&A Mechanical and CLP Resources, both sub-contractors listed on Schedule II, included "dry" HVAC work (Trematore 82, 84-85), which the Court has already concluded constitutes covered work. Thus, the work performed by L&A Mechanical and CLP Resources that is listed on Schedule II of the audit is considered covered work.

This leaves the work completed by Noza Construction, which was described by Trematore as general labor, including broom sweeping and other clean-up work (Trematore 83). Based on the evidence, the Court finds that Plaintiffs have not established as a matter of law that the work performed by Noza Construction constitutes covered work. Thus, summary judgment is denied as to the Noza Construction hours. The parties will be given the opportunity at trial to present evidence on how much of the total work performed by Noza Construction constitutes covered work, and they will also be allowed to argue how Defendant's record-keeping obligations may affect the contributions owed for Noza Construction's work.

2.     **Whether the work triggers the obligation to contribute**

After deciding that the work performed by L&A Mechanical and CLP Resources does constitute covered work, the Court must determine whether the

work of these non-union members triggers the contribution requirement under the CBA. The Court finds that a plain reading of the CBA demonstrates that contributions are due for the work performed. The CBA states that "the Agreement covers the rates of pay, hours and working conditions of *all employees* engaged in the installation of all plumbing and/or pipefitting systems and component parts thereof …" (CBA, Article III, Section 3.1, Doc. 24-10, p. 6 (emphasis added).) This language does not differentiate between union and non-union workers. Further, the CBA also notes that "the Employer agrees that he will not subcontract or sublet out any work covered in Article III to be performed at the site of the construction, repair or alteration unless the Employer to whom the work is subcontracted or sublet is signatory to a U.A. Agreement." (CBA, Art. XIX, Doc. 24-12, p. 3.)

Reading these two provisions together, the Court finds that the CBA intended for there to be an obligation placed on the employer to make contributions for non-union employees who perform covered work. The subcontracting of covered work to non-union employees is forbidden, and thus, it follows that if these employees do perform covered work, the employer should have to make contributions for it. Thus, the Court concludes that all employees – union and non-union – engaged in plumbing and pipefitting work must have contributions paid to the Fund for their covered work performed. Thus, the covered work performed by L&A Mechanical and CLP Resources does trigger Defendant's obligations to make contributions to the Fund.

### D. **Record Keeping Obligations**

Plaintiffs contend that Defendant did not keep records in compliance with ERISA. Pursuant to ERISA, employers must "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). The Eleventh Circuit interpreted the record-keeping obligations of § 1059 in Combs v. King, 764 F.2d 818 (1985). That case essentially decided two things: (1) that an employer does have a record keeping obligation under ERISA § 209, and (2) if there are questions about hours worked, the burden shifts to the employer to come forward with evidence disproving the employee's assertions about hours. Combs, 764 F.2d at 823. The circuit court explained in Combs that the types of records that must be kept are those which would "provide in sufficient detail the necessary basic information and date from which the documents thus required may be verified, explained, or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions…" Id. at 823 (citing 29 U.S.C. § 1027). Based on this duty, the Eleventh Circuit explained that those employers who failed to keep adequate records would have to carry the burden of "disproving" an employee's testimony about the amount of work performed by showing evidence of the work done or evidence to negate the reasonableness of the inference to be drawn from the employee's testimony. Id. at 826.

The parties in this case dispute the applicability of the <u>Combs</u> case to the present facts, but the Court finds it is unnecessary to address the issue of whether the burden-shifting framework in <u>Combs</u> applies in the context of this Motion. The Court finds that no decision can be made on the issue of record-keeping at the summary judgment stage because of a lack of information. Plaintiffs' claim that Defendant did not maintain proper records is supported only by one statement from Gustavo Riveira, who testified as the 30(b)(6) deponent on behalf of LaPadula. In his deposition, Riveira stated the following:

> Q: Is it fair to say that LaPadula did not receive full records from Brian Trematore in conducting this audit?
> …
>
> A: Yes.
>
> Q: In your experience as a payroll auditor, that frequently happens, right?
>
> A: Yes.
>
> Q: In your opinion, when full and adequate records aren't available for an audit, as an auditor you have to do your best to approximate what amounts are owed under the audit, right?
>
> A: Yes
>
> Q: And that's an acceptable practice in your profession, right?
>
> A: Yes. …

(Deposition of Gustavo Riveira for LaPadula, Doc. 22-22, p. 115.) Plaintiffs contend that this statement alone is sufficient to demonstrate that Defendant did not meet its record-keeping obligation. However, the Court disagrees.

20

From <u>Combs</u>, it is apparent that ERISA's record-keeping requirement obligates employers to keep up with records "sufficient to determine the benefits due" to employees. However, Plaintiffs have not shown sufficient evidence to convince the Court that these records were not provided to LaPadula. The statement of Riveira alone is not enough to decide this issue as a matter of law. Neither did Defendant provide adequate information to disprove Plaintiffs' claim as a matter of law. Defendant argued that it was aware of its record-keeping obligations, but that it did not consider non-union workers to be employees within the scope of the record-keeping provisions.

The consequences of inadequate record-keeping can be grim for non-compliant employers. An employer who does not keep proper records must rebut the employee's articulation of the hours worked. <u>Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.</u>, 30 F.3d 692 (6th Cir. 1994). If he cannot rebut the hours, then "an employer is liable for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed." <u>Id.</u> at 697.

Because of these consequences, the Court finds that more information is needed before making any decision about compliance with the record-keeping provisions. The parties will be given the opportunity at trial to present evidence on Defendant's record-keeping obligations and the impact that those obligations may have on the present case.

IV.   **CONCLUSION**

In sum, the Court grants summary judgment to Plaintiffs in part. The Court finds that all "dry" HVAC work performed by Kroll, and other employees – union and non-union – constitutes covered work and requires contributions to be made to the Fund. Thus, pursuant to ERISA § 502, Defendant is obligated to pay any and all unpaid contributions for the work performed; interest on the unpaid contributions; liquidated damages provided for under the Contribution Procedures; and reasonable attorney's fees and costs of the action. 29 U.S.C. § 1132(g)(2).

However, the Court finds that summary judgment is not appropriate on certain portions of the work identified in the audit, specifically, the hours worked by Kroll on clean-up work and the hours worked by Noza Construction. Thus, the case will proceed to a bench trial on June 12, 2013 on the following issues: (1) as a matter of fact, how much of Kroll and Noza's work was clean-up work not covered under the CBA or UA Constitution, and (2) as a matter of law, are Defendant's records for Kroll and Noza's work sufficient under ERISA § 209?

**SO ORDERED**, this 28th day of March, 2013.

_s/Hugh Lawson_____
HUGH LAWSON, SENIOR JUDGE

ebr